**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LINDA STANLEY,<br><br>                    Plaintiff,<br><br>v.<br><br>DIRECT ENERGY SERVICES, LLC,<br><br>                    Defendant. | Civil Action No. _____<br><br><br>Class Action Complaint |

Plaintiff Linda Stanley ("Plaintiff" or "Ms. Stanley"), by her attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., as and for her class action complaint, alleges, with personal knowledge as to her own actions, and upon information and belief as to those of others, as follows:

## NATURE OF THIS CASE

1.      This action seeks to redress Direct Energy Services, LLC's ("Defendant" or "Direct Energy") deceptive and bad faith pricing practices that have caused thousands of residential consumers to pay considerably more for their electricity than they should otherwise have paid.

2.      Defendant has taken advantage of the deregulation of the retail electricity market by exploiting consumers hoping to save on electricity costs.  Specifically, Direct Energy has adopted a business model that includes acquiring smaller third-party energy service companies (or "ESCOs") that have cultivated sizable customer bases by promising to provide -- and providing -- consumers with competitive electricity supply services, including variable rates based on electricity market conditions.  NYSEG Solutions, LLC ("NYSEG Solutions") and

Energetix, Inc. ("Energetix"), two ESCO brands that were operated by a single corporate parent, were two such entities. After acquiring NYSEG Solutions and Energetix, Direct Energy sent uniform notices to their customers to inform them that they were now Direct Energy customers, and to promise that Direct Energy would continue to provide "competitive," market-based energy rates in accordance with customers' existing contracts with NYSEG Solutions and Energetix (which were similar if not the same).[1]

3.      Direct Energy's representations are false and deceptive, and designed to take advantage of consumers' good faith. In reality, following acquisition, Direct Energy abandoned NYSEG Solutions and Energetix's existing competitive, market-based pricing methodology in favor of a methodology that focused on maximizing profits. Direct Energy's variable rates are substantially higher than those otherwise available in the electricity market, and its rates do not reflect changes in the wholesale cost Defendant pays for the electricity it supplies to its retail customers.

4.      As a result, unsuspecting consumers are being fleeced millions of dollars in exorbitant charges for electricity. Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

5.      This suit is brought pursuant to the common law and New York's General Business Law §§ 349, 349-d on behalf of a class of Direct Energy residential consumers who were originally NYSEG Solutions or Energetix customers in the U.S. and who were charged a variable rate for electricity by Direct Energy from April 2013 to the present. This suit seeks,

---

[1] For instance, attached as Exhibit A is a contract obtained through a Freedom of Information Law request, which includes both NYSEG Solutions' and Energetix's logos and by its own express terms applies uniformly to both sets of customers.

*inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

6.      Plaintiff Linda Stanley is a citizen of New York residing in Mahopac, New York. In or around 2009, Ms. Stanley contracted with Defendant's predecessor, NYSEG Solutions, for electricity supply services.  Direct Energy acquired NYSEG Solutions on or around August 23, 2012.  In or around July 2016, Ms. Stanley's utility automatically transitioned her electricity supplier to Direct Energy, after Direct Energy formally changed NYSEG Solutions' name to Direct Energy.  Ms. Stanley remained a variable rate customer of Direct Energy through approximately November 2018, soon after she discovered that Direct Energy failed to charge a variable rate based on the terms of her NYSEG Solutions agreement.  As a result of Defendant's deceptive conduct, Plaintiff incurred excessive charges for electricity.

7.      Defendant Direct Energy is a limited liability company incorporated in Delaware, with its principal place of business in Houston, Texas.  Direct Energy is a third-party energy supplier that provides residential natural gas and electricity services in numerous states across the United States, including New York.

8.      Direct Energy acquired both NYSEG Solutions and Energetix, Inc. in a single transaction with Iberdrola USA.  *See* Rebecca Bream, *Centrica Adds to N American Energy Assets*, Financial Times (July 12, 2012), https://www.ft.com/content/74aef5f6-cc13-11e1-aac1-00144feabdc0.  Like NYSEG Solutions, Energetix was a New York-based ESCO.  Prior to its acquisition agreement with Direct Energy, Iberdrola USA owned both NYSEG Solutions and Energetix, which existed as two separate but operationally similar brands.

## JURISDICTION

9.      Defendant's status as a limited liability company renders it an "unincorporated association" pursuant to the Class Action Fairness Act ("CAFA"), and under CAFA, an unincorporated association is a citizen of the state where it has its principal place of business and the state under whose laws it is organized.  *See* 28 U.S.C. § 1332(d)(10).

10.      Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

11.      The Court has personal jurisdiction over Defendant because it has substantial connection with New York connected to the subject matter of this suit.  Direct Energy sells electricity and natural gas supplies to thousands of New York consumers, including to Plaintiff, and those sales that are the subject matter of this lawsuit.  Indeed, in 2017 alone, Direct Energy had at least tens of thousands of customers in New York.

## OPERATIVE FACTS

### The History Of Deregulation

12.      In the 1990s, numerous state legislatures and state regulatory agencies, including the New York Public Service Commission ("NYPSC"), made the decision to deregulate the market for retail electricity supply.  Among the goals of the reorganization were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates.  As a result, the electricity industry is open to competition, and consumers may choose their energy supplier.

13.      The new energy suppliers, who compete against local utilities, are known as energy service companies, or "ESCOs."  While ESCOs supply the electricity, local utilities

continue to deliver the commodity to consumers' homes. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply.

14.     The public policy motivation for allowing consumers a choice of energy suppliers is to enable retail customers to take advantage of increased competition between suppliers in the open market, as compared to the heavily regulated utility. The fundamental purpose behind this policy is that competition would result in ESCOs being more aggressive and creative than the utility in reducing wholesale purchasing costs and thereby lower prices for retail customers.

15.     Consumers who do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility. For example, in New York, as in many states, the utilities charge their supply customers a rate consistent with market conditions as their rates are based on the New York Independent System Operator's ("NYISO") competitive short-term market (commonly referred to as "real-time" pricing or the "spot market") for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission -- the same costs ESCOs such as Direct Energy incur).[2] New York utilities purchase energy, ancillary services, and capacity from NYISO's wholesale market on a daily basis based on customer consumption, and pass actual costs on to their customers -- without any markups or profit. Because utility rates do not include any profits, they serve as pure reflections of the monthly average market costs of wholesale electricity and associated costs.

16.     By contrast, ESCOs such as Defendant have various options to buy electricity at wholesale for resale to retail customers, including: owning electricity production facilities;

---

[2] All but installed capacity are sold on an hourly basis; installed capacity is sold on a monthly basis.

purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance of the time it is used by consumers, for example by purchasing futures contracts for the delivery of electricity in the future at a predetermined price. The purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity costs, and pass those savings on to consumers.

17.    ESCOs like Direct Energy can also purchase wholesale electricity from short-term markets, at the same price as the utilities.

18.    Therefore, ESCOs should be able to offer rates competitive with, or substantially lower than, utilities, and in fact many do. Indeed, Direct Energy offered fixed rates during the time Plaintiff was a Direct Energy customer that were competitive with or much lower than New York utility rates, and that were substantially lower than its variable rates.

19.    As part of the deregulation plan, ESCOs (like Direct Energy) do not have to file or seek approval for the electricity rates they charge or the methods by which they set their rates with the public services commissions.

20.    Direct Energy exploits deregulation and the lack of regulatory oversight in the energy market to deceptively charge consumers exorbitant rates for electricity. In fact, Defendant's rates are substantially higher than its own fixed rates, other ESCOs' rates, and local utilities' rates, and are untethered from changes in wholesale prices.

21.    As any reasonable consumer would expect, a "competitive" variable "market" rate should reflect the two main components of any market: supply side, as reflected in wholesale market pricing (wholesale costs make up the vast majority of ESCOs' costs to provide retail

electricity) and demand side, as reflected in the rates Direct Energy's competitors charge other retail customers.

**Ms. Stanley's Experience**

22.    In or around 2009, Direct Energy's predecessor, NYSEG Solutions, offered to provide Ms. Stanley with electricity supply services; hoping to save money when market conditions allowed, she agreed.

23.    The standard customer agreement between Ms. Stanley and NYSEG Solutions included a representation that Defendant's variable rate would be a "market" based product. Defendant also provided Ms. Stanley with a rescissionary period during which she could rescind the contract prior to its commencement should she not agree to its terms.

24.    The contract (which was the same for both NYSEG Solutions and Energetix) contains a prominent section representing that the variable rate is a "market" product, and that the market variable rate would be set as follows: "The billing price will vary each billing period and includes all costs (except taxes).  The price will be based on [Energetix, Inc. and/or NYSEG Solutions] managed portfolio pool cost and will include electric energy, capacity, ancillary services, and other associated costs.  Companies managed portfolio pool plan is designed to reduce energy cost through expert analysis and energy purchasing strategies."

25.    In other words, NYSEG Solutions and Energetix promised that they would base the market product rate on the costs incurred to obtain electricity for customers, and that changes in such costs would be based only on fluctuations in their own costs.

26.    Soon after Direct Energy's acquisition of NYSEG Solutions and Energetix, Direct Energy informed NYSEG Solutions customers that their energy accounts were being transitioned to Direct Energy.  Direct Energy represented that it would continue to abide by the terms of

7

NYSEG Solutions' and Energetix's existing customer contracts (including the variable rate pricing provision). In seeking to convince NYSEG Solutions and Energetix customers to stay with Direct Energy, Direct Energy explicitly promised to use its "expertise" to provide legacy NYSEG Solutions and Energetix customers with "competitive" energy rates. When consumers received this representation, they could have changed their service back to the utility rather than allowing their service to transfer to Direct Energy.

27.     Any reasonable consumer would understand based on these representations that Direct Energy's variable rate would reflect wholesale electricity costs, and that Direct Energy would use its expertise to provide variable rates that are competitive with the rates offered by the local utility (which is the primary competitor in virtually every service territory) and other ESCOs.

28.     Ms. Stanley thus reasonably expected that Direct Energy's variable rates would reflect wholesale electricity market costs and be competitive with Defendant's competitors' rates.

29.     Unfortunately, following Direct Energy's acquisition of NYSEG Solutions, Ms. Stanley's rates no longer conformed with the stated variable rate pricing methodology. Instead, Defendant began charging its NYSEG Solutions and Exergetix legacy customers variable rates that were untethered from wholesale electricity costs and competitors' rates in order to maximize its own profits.

30.     Crucially, instead of informing its customers of the material deviation from NYSEG Solutions' and Energetix's contractually guaranteed variable rate pricing methodology post-acquisition and obtaining customers' express consent to the material changes, Direct Energy affirmatively deceived NYSEG Solutions' and Energetix's customers by promising to continue

to provide competitive market-based rates while implementing its own pricing methodology focused on profit maximization.  Defendant knowingly and intentionally ignored the contract's pricing terms -- and its legal obligations -- and instead it engaged in rampant profiteering and price gouging.

31.    The following table identifies the last 24 billing periods (beginning in November 2016) during which Ms. Stanley was enrolled in Direct Energy's variable rate for electricity services, the variable rate Direct Energy charged Ms. Stanley, the corresponding rate her local utility New York State Electric & Gas ("NYSEG") would have charged (which, as discussed above, is a reasonable representation of a rate based on wholesale market conditions), and the differences between Direct Energy's and NYSEG's contemporaneous rates:

| Billing Period | Direct Energy Rate Per kWh[3] | NYSEG Rate Per kWh | Difference Per kWh | Percent Difference |
|---|---|---|---|---|
| 11/1/16 - 11/30/16 | $0.1109 | $0.058606 | $0.052294 | 89.23% |
| 12/1/16 - 12/30/16 | $0.1109 | $0.047322 | $0.063578 | 134.35% |
| 12/31/16 - 01/30/17 | $0.1109 | $0.063932 | $0.046968 | 73.47% |
| 01/31/17 - 02/28/17 | $0.1109 | $0.078168 | $0.032732 | 41.87% |
| 03/01/17 - 03/29/17 | $0.1109 | $0.079141 | $0.031759 | 40.13% |
| 03/30/17 - 05/02/17 | $0.117606 | $0.056587 | $0.061019 | 107.83% |
| 05/03/17 - 05/30/17 | $0.1259 | $0.066473 | $0.059427 | 89.40% |
| 05/31/17 - 06/29/17 | $0.1259 | $0.072504 | $0.053396 | 73.65% |
| 06/30/17 - 07/31/17 | $0.135103 | $0.070735 | $0.064368 | 91.00% |
| 08/01/17 - 09/01/17 | $0.1389 | $0.063721 | $0.075179 | 117.98% |
| 09/02/17 - 09/29/17 | $0.1389 | $0.076058 | $0.062842 | 82.62% |
| 09/30/17 - 10/31/17 | $0.140256 | $0.073650 | $0.066606 | 90.44% |
| 11/01/17 - 11/30/17 | $0.1367 | $0.059210 | $0.077490 | 130.87% |
| 12/01/17 - 01/02/18 | $0.131018 | $0.063315 | $0.067703 | 106.93% |
| 01/03/18 - 01/30/18 | $0.1313 | $0.077033 | $0.054267 | 70.45% |
| 01/31/18 - 03/01/18 | $0.125657 | $0.074288 | $0.051369 | 69.15% |
| 03/02/18 - 03/29/18 | $0.1468 | $0.053867 | $0.092933 | 172.52% |
| 03/30/18 - 04/30/18 | $0.1468 | $0.095677 | $0.051123 | 53.43% |
| 05/01/18 - 05/30/18 | $0.1438 | $0.069948 | $0.073852 | 105.58% |
| 05/31/18 - 06/30/18 | $0.135477 | $0.075363 | $0.060114 | 79.77% |
| 07/01/18 - 07/30/18 | $0.1699 | $0.070853 | $0.099047 | 139.79% |
| 07/31/18 - 08/30/18 | $0.173771 | $0.068123 | $0.105648 | 155.08% |
| 08/31/18 - 09/28/18 | $0.180272 | $0.082365 | $0.097907 | 118.87% |
| 09/29/18 - 11/01/18 | $0.165782 | $0.080572 | $0.085210 | 105.76% |

---

[3]  Electricity is sold to consumers by the kilowatt hour, or kWh.

32.     Not only is Ms. Stanley's local utility (NYSEG) Direct Energy's primary competitor in Ms. Stanley's service territory (as the utility virtually always is), but NYSEG's rates are also an ideal indicator of market prices.  As explained above, NYSEG's rates are based on NYISO competitive short-term public market (also known as "real-time" pricing or the "spot market") for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission -- the same costs ESCOs such as Direct Energy incur) and are set without any markups or profit.  In other words, NYSEG purchases wholesale electricity for its customers every day on an open free market; Direct Energy could do the same. Consequently, NYSEG's electricity rates are the ideal comparator here because they are Direct Energy's primary competitor's rates and represent wholesale market prices for electricity and associated costs.

33.     Indeed, given Direct Energy's self-proclaimed "expertise" in purchasing electricity, it is most likely that Direct Energy was able to and did purchase wholesale electricity at the same or lower cost than the utility, at least over time.  If Direct Energy did not have such expertise, it deceived its newly acquired customers to their direct detriment.  Put another way, either Direct Energy misled its customers about its expert ability to provide competitive rates (causing injury to customers who paid a high variable rate as a result), or it misled them when it promised to base the variable rate on wholesale costs (as provided in the legacy contracts) and that its rate would be competitive.

34.     That Defendant's variable rate is not in fact a competitive market rate based on the wholesale cost of electricity is demonstrated by the fact that Direct Energy's rates were consistently significantly higher than NYSEG's rates.  From November 2016 to November 2018, Direct Energy's variable rates were higher than NYSEG's rates *every single month*.  On average,

during this period, Direct Energy's variable rates were 97.5% higher than NYSEG's rates. In fact, of these 24 months, there were 11 months where Defendant's rates were *more than double* NYSEG's rates, including one month during the spring (when wholesale costs are typically low) when Direct Energy charged a rate 173% higher than NYSEG's rate.

35.    That Direct Energy's variable rate does not reflect electricity costs is also demonstrated by the disconnect between fluctuations in wholesale and retail electricity prices (as demonstrated by NYSEG's rates, which are a pure reflection of actual wholesale market prices and retail prices) and Direct Energy's rates. These discrepancies exist both month-to-month and in pricing trends over time.

36.    For example, when NYSEG's rate declined from $0.0743 to $0.0539 per kWh (decreasing by 27%) from February to March 2018, Direct Energy's rate rose from $0.1257 to $0.1468 per kWh (increasing by 17%). Likewise, whereas NYSEG's rate decreased from $0.0791 to $0.0566 per kWh (declining by 28%) from March to April 2017, Direct Energy's rate increased from $0.1109 to $0.1176 per kWh (increasing by 6%).

37.    The discordance in rates is similarly apparent with respect to pricing trends over time. Between June and August 2018, NYSEG's rate steadily declined from $0.0754 to $0.0681 per kWh (a decline of 10%), while Direct Energy's rate steadily rose from $0.1355 to $0.1738 per kWh (an increase of 28%). When NYSEG's rate steadily declined from $0.0725 to $0.0637 per kWh (a decline of 12%) from June to August 2017, Direct Energy steadily increased its already exorbitant prices from $0.1259 to $0.1389 per kWh (an increase of 10%).

38.    Even when the rates trended in the same direction, the differences remain glaring: between April and May 2018, NYSEG's rates steadily decreased from $0.0957 to $0.0699 per

kWh (decreasing 27%), whereas Direct Energy's rate merely decreased from $0.1468 to $0.1438

per kWh (decreasing 2%).

39.     While NYSEG and Direct Energy may not purchase electricity in precisely the

same manner, ESCOs such as Direct Energy have the ability to purchase electricity from the

same market as the utilities (*i.e.*, NYISO's spot market) at the same rates.  Thus, over time the

costs they incur could be commensurate, particularly in light of Direct Energy's expertise in

purchasing electricity on the market.

40.     Moreover, Direct Energy has a tactical advantage over the utility as it can

purchase electricity from any number of markets using any number of purchasing and hedging

strategies, and therefore its cost for purchasing electricity should at the very least reflect -- if not

undercut -- utility prices.

41.     Instead, Direct Energy's rates are unfathomably and consistently higher than the

local utility's rates.

42.     Direct Energy's stark rate disparities with those of the local utility, wherein Direct

Energy's rates were higher 100% of the last 24 months that Ms. Stanley was charged a variable

rate, considered together with the fact that Direct Energy's rates do not reflect market

fluctuations, demonstrate that Direct Energy does not charge a competitive market rate as it

promised legacy customers, but rather gouges its customers by charging outrageously high rates.

43.     The cost of wholesale electricity is the primary component of the non-overhead

costs Direct Energy incurs.  As explained above, the other cost factors that may affect its variable

rate in (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are

included in NYSEG's rates as well.  These additional wholesale costs are relatively insignificant

in terms of the overall costs Defendant incurs to provide retail electricity, and do not

substantially fluctuate over time.  Moreover, other ESCOs incur these costs as well, yet they offer substantially lower rates, just as Direct Energy itself did for its fixed rate offerings.

44.      Therefore, these other cost factors cannot explain Defendant's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs.

45.      Additionally, Defendant's ability to make a profit does not justify its outrageously high rates.  A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling consumers retail electricity.  However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity in the market, and also that Defendant's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead outrageously higher.

46.      Defendant's statements and omissions regarding its electricity rates are materially misleading because the most important consideration for any reasonable consumer when choosing an energy supplier is price.  In fact, all that Defendant offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other ESCOs or local utilities.  Other than potential price savings, there is nothing to differentiate Defendant from other ESCOs or local utilities, and the potential for price savings is the only reason any reasonable consumer would contract with Defendant for electricity supply.

47.      Direct Energy knows full well that it charges variable rates that are unconscionably high.  The misrepresentations Defendant makes regarding its purportedly competitive market-based variable rate were made for the sole purpose of convincing legacy customers to transition to Defendant's electricity supply so that it can reap outrageous profits to the direct detriment of consumers without regard to the consequences high utility bills cause such

consumers.  As such, Defendant's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action on her own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all Direct Energy customers in the United States who were legacy NYSEG Solutions and/or Energetix customers and who were charged a variable rate for residential electricity services by Direct Energy from April 2013 to the present (the "Class").

49.    Plaintiff also brings this action on her own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a subclass (the "Subclass") of Direct Energy customers in New York who were legacy NYSEG Solutions and/or Energetix customers and who were charged a variable rate for residential electricity services by Direct Energy from April 2013 to the present.

50.    Excluded from the Class and Subclass (collectively, the "Classes") are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

51.    This action is brought as a class action for the following reasons:

a.    The Classes consist of thousands of persons and are therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.    There are questions of law or fact common to the Classes that predominate over any questions affecting only individual members, including:

       i.       whether Defendant breached its contracts with consumers by charging variable rates not based on market conditions;

       ii.      whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.*, to price gouge or upset the reasonable expectation of consumers that Direct Energy variable rates would be competitive and reflect changes in the wholesale and retail prices of electricity;

       iii.     whether Defendant violated N.Y. Gen. Bus. Law § 349 *et seq.*;

       iv.     whether Plaintiff and the Classes have sustained damages and, if so, the proper measure thereof; and

       v.     whether Defendant should be enjoined from continuing to charge variable rates not based on market conditions;

       c.     The claims asserted by Plaintiff are typical of the claims of the members of the Classes;

       d.     Plaintiff will fairly and adequately protect the interests of the Classes, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

       e.     Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

       f.     Defendant has acted on grounds that apply generally to the Classes, namely representing that its variable rates are competitive and based on market conditions, when its rates are in fact always substantially higher, such that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Classes;

g.      A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.      Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

ii.      It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

iii.      When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

iv.      A class action will permit an orderly and expeditious administration of claims, foster economies of time, effort, and expense and ensure uniformity of decisions;

v.      The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

vi.      Defendant has acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

52.      Defendant's violations of N.Y. Gen. Bus. Law § 349 *et seq.* are applicable to all members of the Subclass, and its violations of the common law are applicable to all members of the Class, and Plaintiff is entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (On Behalf of the Class)

53.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

54.     Direct Energy customers have customer agreements whose variable rate terms are substantially similar.

55.     Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity.

56.     Pursuant to its customer contracts, Defendant agreed to charge a market variable rate for electricity based on wholesale electricity costs, *i.e.*, its cost of purchasing electricity for delivery to customers from the same utility territory, and the prices charged by local utility companies and other competitors.

57.      Pursuant to the contracts, Plaintiff and the Class paid the variable rates Defendant charged for electricity.

58.     However, Defendant failed to perform its obligations under its contracts to charge rates based primarily upon electricity costs and the rates utilities and other ESCOs charge. Indeed, Defendant charged a variable rate for electricity that was untethered from the factors upon which the parties agreed the rate would be based.

59.     Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based its rate on the agreed upon factors.

60.     By reason of the foregoing, Defendant is liable to Plaintiff and other Class members for the damages that they have suffered as a result of Defendant's actions, the amount

of such damages to be determined at trial, plus attorneys' fees.

## SECOND CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith & Fair Dealing
### (On Behalf of the Class)

61.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

62.    Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

63.    Under the contract, Defendant had unilateral discretion to set the variable rate for electricity based on market conditions and other factors, such as the amount of profit Defendant hoped to earn from the sale of electricity in a customer's utility area.

64.    Plaintiff reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect the market and wholesale prices for electricity and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class members would not have agreed to buy electricity from Defendant.

65.    Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff and other Class members' reasonable expectations that the variable rate for electricity would be commensurate with market conditions.

## THIRD CAUSE OF ACTION
### Violations of N.Y. GEN. BUS. LAW § 349
### (On Behalf of the New York Subclass)

66.    Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

67.     Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349.

68.     Defendant's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect consumers.

69.     Defendant's misrepresentations and false, deceptive, and misleading statements and omissions with respect to the variable rates it charges for electricity, as described above, constitute deceptive practices in connection with the marketing, advertising, promotion, and sale of electricity in violation of N.Y. Gen. Bus. Law § 349.

70.     Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity from Direct Energy.

71.     Defendant knew at the time it promised prospective customers that they will be billed a market variable rate based on market conditions that its promise was false because at the time of contract formation Direct Energy knew that its variable rate was untethered from market conditions.

72.     Defendant's intentional concealments were designed to deceive current and prospective variable rate customers into believing that rates will be commensurate with market conditions and the specified factors in the contract.  By concealing its actual pricing strategy (maximizing profits), Defendant deprives consumers from being able to make informed purchasing decisions.

73.     Defendant's practices are unconscionable and outside the norm of reasonable business practices.

74.     As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and Subclass members remained with Direct Energy after acquisition and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a competitive rate based on market conditions and the factors specified in the contract.  By reason of the foregoing, Defendant is liable to Plaintiff and Subclass members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

75.     Plaintiff and Subclass members further seek equitable relief against Defendant. Pursuant to N.Y. Gen. Bus. Law § 349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices as alleged herein to be unlawful, an Order enjoining Defendant from undertaking any further unlawful conduct, and an order directing Defendant to refund to Plaintiff and the Subclass all amounts wrongfully assessed, collected, or withheld.

76.     Defendant knows full well that it charges an unconscionably high rate, and the misrepresentations it makes with regard to the rate being market based were made for the purpose of inducing consumers to sign up for Defendant's electricity supply so that it can reap outrageous profits to the direct detriment of New York consumers without regard to the consequences high utility bills cause such consumers.  As such, Defendant's actions are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, or accompanied by wanton and willful disregard for consumers' well-being.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Violations of N.Y. GEN. BUS. LAW § 349-d**
**(On Behalf of the New York Subclass)**

77.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

78.     N.Y. Gen. Bus. Law §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

79.     N.Y. Gen. Bus. Law § 349-d(6) provides that "[n]o material change shall be made in the terms or duration of any contract for the provision of energy services by an ESCO without the express consent of the customer."

80.     N.Y. Gen. Bus. Law § 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."

81.     Defendant offers for sale energy services for and on behalf of an ESCO.

82.     Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law §§ 349-d(3), 349-d(6), and 349-d(7) as described above.

83.     Defendant did not receive express consent from NYSEG Solutions or Energetix customers approving any changes to their customer agreements.

84.     Because Direct Energy does not set its variable rate based on the terms of the legacy NYSEG Solutions and Energetix customer agreements, it fails to clearly and conspicuously identify all variable changes.

85.     Defendant's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect energy consumers.

22

86.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiff and Subclass members have suffered injuries and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

87.    Plaintiff further seeks an Order enjoining Defendant from undertaking any further unlawful conduct, pursuant to N.Y. Gen. Bus. Law § 349-d(10).

WHEREFORE, Plaintiff respectfully requests that the Court should enter judgment against Defendant as follows:

1.    Certifying this action as a class action, with a class and subclass as defined above;

2.    On Plaintiff's First Cause of Action, awarding against Defendant damages that Plaintiff and the other Class members have suffered as a result of Defendant actions;

3.    On Plaintiff's Second Cause of Action, awarding against Defendant damages that Plaintiff and the other Class members have suffered as a result of Defendant's actions, trebled;

4.    On Plaintiff's Third Cause of Action, awarding against Defendant damages that Plaintiff and the other Subclass members have suffered, trebled, and granting appropriate injunctive relief;

5.    On Plaintiff's Fourth Cause of Action, awarding against Defendant damages that Plaintiff and the other Subclass members have suffered as a result of Defendant's actions, but not less than $500 for each violation, trebled;

6.    Awarding Plaintiff and the Classes punitive damages;

7.    Awarding Plaintiff and the Classes interest, costs and attorneys' fees; and

8.    Awarding Plaintiff and the Classes such other and further relief as this Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiff hereby demands a trial by jury.

Dated: April 26, 2019
      White Plains, New York

                        **FINKELSTEIN, BLANKINSHIP,**
                        **FREI-PEARSON & GARBER, LLP**

                        D. Greg Blankinship
                        Todd G. Garber
                        Chantal Khalil
                        445 Hamilton Avenue
                        White Plains, New York 10601
                        Tel: (914) 298-3281
                        Fax: (914) 824-1561
                        gblankinship@fbfglaw.com
                        tgarber@fbfglaw.com
                        ckhalil@fbfglaw.com

                        Matt Schultz*
                        Bill Cash*
                        **LEVIN, PAPANTONIO, THOMAS,**
                        **MITCHELL, RAFFERTY & PROCTOR, P.A.**
                        316 South Baylen St.
                        Pensacola, Florida 32502
                        Tel: (850) 435-7059
                        mschultz@levinlaw.com
                        bcash@levinlaw.com
                        *Pro Hac Vice Application Forthcoming*

                        *Attorneys for Plaintiff and the Putative Class*

24