UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA STANLEY,

Plaintiff,

v.

DIRECT ENERGY SERVICES, LLC,

Defendant.

No. 19-CV-3759 (KMK)

OPINION & ORDER

Appearances:

Douglas Gregory Blankinship, Esq.
Todd Seth Garber, Esq.
Chantal Khalil, Esq.
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP
White Plains, NY
*Counsels for Plaintiff*

William Franklin Cash, III, Esq.
Matthew David Schultz, Esq.
Levin, Papantonio, Thomas, Mitchell, Eschsner & Proctor, P.A.
Pensacola, FL
*Counsels for Plaintiff*

Andrew Kasner, Esq.
Michael D. Matthews. Esq.
Diane Wizig, Esq.
McDowell Hetherington LLP
Houston, TX
*Counsels for Defendant*

Steven Miles Lucks, Esq.
Fishkins Lucks LLP
Newark, NJ
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Linda Stanley ("Plaintiff") brings this Action asserting claims against Direct Energy

Services, LLC ("Defendant"), for breach of contract, breach of the implied covenant of good

faith and fair dealing, violations of the New York General Business Law ("NYGBL"), and, in the

alternative to breach of contract, unjust enrichment.  (*See* Am. Compl. ¶¶ 67–109 (Dkt. No. 21).)

Plaintiff claims that Defendant breached the promises it purportedly made when offering

"competitive" utility rates based on the "market" in its variable rate plan and, instead, went on to

charge prices that were allegedly untethered to any understanding of "competitive" or "market"

prices in the industry.  (*See generally id.*)  Plaintiff also purports to represent a class of

Defendant's customers in a similar situation.  (*See id.* ¶¶ 62–66.)  Before the Court is

Defendant's Motion To Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6)

(the "Motion").  (Not. of Mot. (Dkt. No. 27).)  For the following reasons, the Motion is granted

in part and denied in part.

## I.  Background

### A.  Factual History

The following facts are drawn from the Amended Complaint and the exhibits therein, and

are taken as true for purposes of resolving the instant Motion.

#### 1.  The Utility Market

In the 1990s, state legislatures and agencies decided to partially deregulate the market for

retail electricity supply.  (Am. Compl. ¶ 13.)  The goal was to increase competition in the field

and provide customers with choices regarding their energy supplier.  (*Id.*)  The new energy

suppliers are known as "ESCOs," and they aim to provide a price competitor to local utilities.

(*Id.* ¶ 14.)  Although the local utility continues to deliver the commodity to people's homes and

bill the customer for the requisite costs, an ESCO—should the consumer choose to contract with them—sets the price for the supply.  (*Id*.)  Consumers may still choose to receive their supply from a local utility.  (*Id*. ¶ 16.)  Plaintiff alleges that, in New York, local utilities charge their supply customers "a rate consistent with market conditions," which Plaintiff defines as the New York Independent System Operator's ("NYISO") competitive short-term market.  (*Id*.)  Local utilities allegedly pass the costs on to their consumers "without any markups or profit."  (*Id*.)  On the other hand, ESCOs are able to buy electricity in a variety of ways, including by owning electricity production facilities, purchasing electricity from wholesale marketers and brokers, or trading on futures.  (*Id*.)  These purchasing strategies may result in more competitive rates for consumers.  (*Id*.)  ESCOs do not have to file or seek approval for the rates they charge or the methods by which they set their rates.  (*Id*. ¶ 20.)

However, in an effort to curb any potential abuse in rate-setting by ESCOs, the New York legislature passed NYGBL § 349-d.  The statute states that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."  N.Y. Gen. Bus. Law § 349-d(3).  It also provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."  *Id*. § 349-d(7).

### 2.  Plaintiff's Contract with Defendant

On December 30, 2009, one such ESCO (and Defendant's predecessor), NYSEG Solutions, LLC ("NYSEG Solutions") offered to provide Plaintiff with a competitive fixed rate

for electricity supply services.  (Am. Compl. ¶ 24.)[1]  The offer included the general terms of the agreement and provided Plaintiff with a three-day window to rescind any agreement with NYSEG Solutions.  (*See* Am. Compl. Ex. B ("2009 NYSEG Solutions Agreement") (Dkt. No. 21-2).)  Plaintiff accepted the offer.  (Am. Compl. ¶ 24.)

On November 23, 2012, Plaintiff received a renewal notification from NYSEG Solutions and Defendant (the "2012 Renewal Notification").  (*Id.* ¶ 25.)  The letter explained that, on August 23, 2012, Defendant had acquired NYSEG Solutions.  (*Id.*)  The letter offered a renewal at a fixed rate for six months, and the terms attached to the letter explained that, unless a future renewal notification explained otherwise, the account would automatically convert to a monthly variable price agreement after those six months.  (*Id.* ¶ 26; *see also id.* Ex. C ("2012 Renewal Not.") ("If a renewal notification does not include a new fixed, blended, or indexed price termed offer, accounts will automatically convert to a monthly variable price agreement with no end date and no associated termination fee.") (Dkt. No. 21-3).)

On May 9, 2013, Plaintiff received another renewal notification from NYSEG Solutions (the "2013 Renewal Notification").  (*See id.* ¶ 28; *see also id.* Ex. D ("2013 Renewal Not.") (Dkt. No. 21-4).)  The letter explained that the new "Agreement Term" was "Monthly," that the "Renewal Price" was "Variable," and again noted that NYSEG Solutions had been acquired by Defendant, although it would continue to call itself NYSEG Solutions.  (*Id.*)  The letter stated that Defendant "constantly strive[s] to give . . . complete customer satisfaction and the most competitive pricing" and that the "Pricing Type" under the contract was "Market."  (*Id.*)  The letter also explained that Plaintiff could reject the renewal terms within three business days of receiving the first billing statement and that either party could cancel the month-to-month service

---

[1] NYSEG Solutions is not equivalent to or affiliated with the public utility company, the New York State Electric & Gas Corporation, also known as "NYSEG."

with 30 days' advance written notice of termination to the other party.  (*See id.*)  Like the previous renewal notifications, more comprehensive terms were attached to the summary letter. (*See id.*)  Plaintiff also submits a template letter and "Frequently Asked Questions" document, which states that NYSEG Solutions will continue to provide "the same competitive energy rates and exceptional customer service [consumers] have come to know and trust," that Defendant is one of "North America's largest competitive energy suppliers of electricity," and that, despite the acquisition, consumers will "continue to receive the same competitive rates and the highest level of support."  (Am. Compl. Ex. E ("NYSEG Solutions FAQ") (Dkt. No. 21-5).)  Plaintiff notes that she obtained this document through a Freedom of Information Law request and does not specifically allege that Plaintiff herself received or saw this document.  (*See* Am. Compl. 10 n.6.)

### 3.  Defendant's Pricing

According to Plaintiff, Defendant failed to provide the competitive pricing it had promised.  To support its argument, Plaintiff includes within the Amended Complaint data from the 24 recent billing periods—beginning in November 2016 and ending in November 2018— comparing Defendant's charged rate per kilowatt hour ("kWh") with the rates of the local utility service.  (*See id.* at 12 ("Pl.'s Table 1").)  Plaintiff's calculations allege that, throughout this period, Defendant charged between 40% to 172% more than the local utility rate.  (*See id.*) According to Plaintiff, the local utility rates function as "an ideal indicator of market prices" because they are based on the NYISO public market and "are set without any markups or profit." (*Id.* ¶ 41.)  Plaintiff also points out that, in certain periods, Defendant's rates ran contrary to the trends present in local utility rates.  For example, from February to March 2018, although the local utility rate decreased by 27%, Defendant's consumer rate rose by 17%.  (*Id.* ¶ 45.) Similarly, between March and April 2017, the local utility's rate decreased by 28%, but

Defendant's consumer rate increased by 6%. (*Id.*) Plaintiff also alleges that even when Defendant's rates followed the local utility rates, they did not reflect the substantial drop in pricing. For example, although the local utility rates dropped 27% between April and May 2018, Defendant's rates only dropped 2% within the same period. (*Id.* ¶ 47.)

Plaintiff also includes a second table comparing Defendant's rates with what Plaintiff alleges are "Market Supply Costs." (*See id.* at 17 ("Pl.'s Table 2").) Plaintiff alleges that the Market Supply Costs were estimated by an unnamed expert who tracked NYISO prices in Plaintiff's utility zone and included other small costs that Defendant might have incurred. (*See id.* ¶ 53.) Based on Plaintiff's expert's calculations, Defendant's customer rates were higher than Market Supply Costs for each month and were, on average, 176% higher than those costs. (*Id.* ¶ 55.) Plaintiff also claims that, despite downward trends in Market Supply Costs, Defendant's customer rates increased over a number of periods within the overall billing period included in the chart. (*Id.* ¶ 56.) According to Plaintiff, "other ESCOs incur these costs as well, yet they offer substantially lower rates" than Defendant. (*Id.* ¶ 57.) Plaintiff cites to Defendant's allegedly lower fixed rates as one example of lower ESCO rates. (*Id.*)

Plaintiff argues that Defendant should not be permitted to charge high rates out of alignment with the comparators set forth in the Amended Complaint. (*Id.* ¶ 58.) Plaintiff also alleges that Defendant's statements in the Renewal Notifications and accompanying terms regarding its rates were "materially misleading" because they failed to provide Plaintiff or other customers with any price savings. (*Id.* ¶ 60.)

### 4. Class Action Allegations

Plaintiff alleges that she brings this Action on behalf of all of Defendant's customers in the United States who were "legacy NYSEG Solutions and/or Energetix[, Inc.] customers . . .

who were charged a variable rate for electricity services" by Defendant between April 2013 and the present (the "Class").  (*Id*. ¶ 62.)[2]  Plaintiff also purports to represent a "[S]ubclass" of Defendant's customers in New York who were "legacy NYSEG Solutions and/or Energetix customers . . . who were charged a variable rate for residential electricity services by" Defendant between April 2013 and the present.  (*Id*. ¶ 63.)  Plaintiff alleges, inter alia, that there are common questions of law or fact to both the Class and Subclass regarding whether Defendant breached its consumer contracts by failing to charge variable rates commensurate to "market conditions."  (*Id*. ¶ 65.)  Additionally, Plaintiff alleges that violations of NYGBL § 349-d would be applicable to all members of the Subclass.  (*Id*. ¶ 66.)

Based on the foregoing, Plaintiff brings breach of contract claims, claims under the NYGBL, and an unjust enrichment claim based on Defendant's variable rate pricing scheme.

B.  Procedural History

On April 26, 2019, Plaintiff filed the original Complaint against Defendant.  (*See* Compl. (Dkt. No. 1).)  Following the submission of Pre-Motion Letters, the Court held a Pre-Motion Conference regarding Defendant's anticipated motion to dismiss the Complaint on September 12, 2019, where it directed Plaintiff to file an amended complaint by October 18, 2019.  (*See* Dkt. (minute entry for Sept. 12, 2019).)

Plaintiff filed the Amended Complaint and the accompanying exhibits on October 18, 2019.  (*See* Am. Compl.)  Following another Pre-Motion Conference, a briefing schedule for the instant Motion was set.  (*See* Scheduling Order (Dkt. No. 26).)  Defendant filed its opening papers on February 7, 2020.  (*See* Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. ("Def.'s

---

[2] Plaintiff alleges that Energetix, Inc. ("Energetix") was another ESCO brand that was operated by the same corporate parent that operated NYSEG Solutions.  (Am. Compl. ¶ 2.)  Following Defendant's acquisition of both NYSEG Solutions and Energetix, Defendant allegedly sent "uniform notices" to former customers of both.  (*Id*.)

Mem."); Decl. of Michael D. Matthews, Jr., Esq. in Supp. of Mot. ("Matthews Decl.") (Dkt. Nos.

27–28).)  Plaintiff filed her Opposition on March 13, 2020.  (*See* Pl.'s Mem. of Law in Opp'n to

Mot. ("Pl.'s Mem.") (Dkt. No. 32).)  Defendant filed its Reply on April 10, 2020.  (*See* Def.'s

Reply Mem. of Law in Supp. of Mot. ("Def.'s Reply Mem.") (Dkt. No. 33).)

## II.  Discussion

Defendant argues that none of Plaintiff's alleged rate comparators is appropriate; that

Defendant did not breach any actionable term within its renewal contract with Plaintiff; that the

NYGBL claims are time-barred and/or meritless; that the claim for implied breach of the

covenant of good faith and fair dealing should be dismissed as duplicitous of the breach of

contract claims; and that any unjust enrichment claim is barred by the existence of a written

contract.  (*See generally* Def.'s Mem.)  Defendant also argues that Plaintiff has failed to

sufficiently allege standing on behalf of either the Class or Subclass to bring such claims.  (*See

id.* at 24.)  The Court addresses the arguments as needed.

### A.  Standard of Review

#### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has

authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233,

241 (E.D.N.Y. 2014) (quotation marks omitted) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d

Cir. 2008), *vacated and superseded on reh'g on other grounds*, 585 F.3d 559 (2d Cir. 2009) (en

banc)).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a

claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the

district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l

Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and quotation marks

omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014)

(describing subject matter jurisdiction as the "threshold question" (citation and quotation marks

omitted)).  The Second Circuit has explained that a challenge to subject-matter jurisdiction

pursuant to Rule 12(b)(1) may be "either facial or fact-based."  *See Carter v. HealthPort Techs.*,

LLC, 822 F.3d 47, 56 (2d Cir. 2016).  When a defendant raises a facial challenge to standing

based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary

burden," and a court must determine whether the plaintiff asserting standing "alleges facts that

affirmatively and plausibly suggest that the plaintiff has standing to sue."  *Id.* (alteration and

quotation marks omitted) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145

(2d Cir. 2011)).  In making such a determination, a court must accept as true all allegations in the

complaint and draw all inferences in the plaintiff's favor.  *Id.* at 57.

### 2.  Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (quotation marks and alteration omitted).

Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the

speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the

line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the

pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery

for a plaintiff armed with nothing more than conclusions.").

 In considering a motion to dismiss, the Court "must accept as true all of the factual

allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Further,

"[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable

inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304

n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

 B.  Analysis

  1.  Breach of Contract Claims

 "[T]o state validly a breach of contract claim under New York law, 'a plaintiff need only

allege (1) the existence of an agreement, (2) adequate performance of the contract by the

plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Fort Prods., Inc. v. Men's

Med. Clinic, LLC*, No. 15-CV-376, 2016 WL 797577, at *2 (S.D.N.Y. Feb. 23, 2016) (alteration

omitted) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d

168, 177 (2d Cir. 2004)).  "Even under the more relaxed pleading standards of Rule 8, the complaint must still allege the provisions of the contract upon which the claim is based, and, at a minimum, the terms of the contract, each element of the alleged breach and the resultant damages."  *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03-CV-3120, 2009 WL 1492196, at *9 (S.D.N.Y. May 27, 2009) (citation, alterations, and quotation marks omitted).

Here, Plaintiff alleges that Defendant made promises in the 2013 Renewal Notification that it would provide "the most competitive pricing," that the "Pricing Type" would be "Market," that the "Renewal Price" would be "Variable," and that it would use an unspecified "monthly variable rate methodology" to set its monthly variable rate.  (*See* 2013 Renewal Not.; Pl.'s Mem. 17.)  The 2013 Renewal Notification provides no further information as to how Defendant aimed to calculate its monthly variable rate or what "Market" means in this context.  (*See generally* 2013 Renewal Not.)  Importantly, the 2013 Renewal Notification also does not specifically note that the monthly variable rate is subject to any level of discretion, either.  (*See generally id.*)  Indeed, the word "discretion" does not appear within the 2013 Renewal Notification at all.  To support its allegations that Defendant did not abide by promises it might have made by using this language, Plaintiff offers numerical comparisons of Defendant's rate to the rates that the local utility charged, (*see* Pl.'s Table 1), to "Market Supply Costs" derived by an expert, (*see* Pl.'s Table 2), and by alleging that Defendant's rates are even higher than those of other ESCOs, (*see* Am. Compl. ¶¶ 30, 57, 60).  Defendant argues that these comparisons are either invalid as a matter of law or insufficiently pled.

The Second Circuit has addressed the question of ESCO contracts and valid comparators in two recent cases.  In *Richards v. Direct Energy Servs., LLC*, 915 F.3d 88 (2d Cir. 2019), the Second Circuit affirmed a district court's decision to grant summary judgment to Defendant in a

case that made similar claims regarding Defendant's ESCO contracts in Connecticut. *Id.* at 96. In that case, the Second Circuit noted that Defendant did not breach its contract to the plaintiff in part because the contract stated that Defendant "had 'discretion' to set the variable rate 'based upon business and market conditions.'" *Id.* at 98 (record citation omitted). The Second Circuit reasoned that that clause could not have suggested to any reasonable customer that "the variable rate [must] bear[] a direct relationship to [Defendant's] procurement costs." *Id.* The Second Circuit went on to opine that there could be no breach of good faith and fair dealing, either, because "the entire point of electricity deregulation was to allow the market, rather than [Connecticut's utility regulatory authority], to determine rates." *Id.* at 99 (footnote omitted). Therefore, it would be illogical to measure Defendant's pricing against local utility rates where the plaintiff had contracted for a "variable rate set at [Defendant's] discretion," especially where the plaintiff "voluntarily chose this contract after considering more than forty competitor options because he thought it was the best available." *Id.* at 99–100 (citation omitted).

However, a few months later, in *Mirkin v. XOOM Energy LLC*, 931 F.3d 173 (2d Cir. 2019), the Second Circuit reversed a district court's grant of a motion to dismiss and denial of leave to amend a complaint that alleged that an ESCO breached its promise to provide a monthly variable rate "based on [the defendant's] actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." *Id.* at 174–75 (record citation and emphasis omitted). There, the Second Circuit held that the plaintiffs had plausibly alleged, through "expert calculations . . . [, which] relied on publicly available NYISO data," the existence of utility rates that materially deviated from the defendant's Market Supply Cost. *Id.* at 177. In that holding, the Second Circuit also acknowledged that pleading deviations

from rates charged by the local New York City utility company could be "another reflection of the Market Supply Cost." *Id*. at 178 & n.2 (record citation omitted).

The instant Action falls somewhere between the two Second Circuit goalposts described above.  Although Defendant never specifically promised that its monthly variable rate would be based on "actual and estimated supply costs," *id*. at 175 (record citation and emphasis omitted), nor did Defendant explicitly state that the variable rate would be subject to "[Defendant's] discretion" or that it "may be higher or lower each month based upon business and market conditions," *Richards*, 915 F.3d at 97 (record citation omitted).  Defendant seeks to argue that *Richards* stands for the proposition that local utility rates may *never* serve as a valid comparator for an ESCO's obligations to consumers, but this Court does not view the *Richards* holding to be quite so expansive.  (*See* Def.'s Mem. 6–7.)  *Richards* relied heavily on the contractual language explicitly indicating that the plaintiff's rates were subject to Defendant's *discretion*, a critical term that is absent here.  *See* 915 F.3d at 92–93 ("By the contract's plain terms, [Defendant] promised that the variable rate would be set in its discretion and that it would reflect 'business and market conditions,' a phrase which encompasses more than just procurement costs.").  Unlike *Richards*, there is also no language to suggest that price may also be dependent on "business . . . conditions." *Id*. at 98.  Indeed, other than saying that Defendant would use a "variable rate methodology" to calculate its monthly variable rate, the only other descriptor for Defendant's variable rate is the label, "Pricing Type," which is noted as "Market."  (2013 Renewal Not.)  At minimum, there is a reasonable contract interpretation that "Market" meant that Defendant's variable rate would be tethered to some degree to supply costs or to competitors' rates.  Even if it is true that local utility rates cannot directly serve as a valid comparator for the reasonability of an ESCO's rates, the Second Circuit noted in *XOOM* that

rates charged by a local utility may be "another reflection of the Market Supply Cost."  931 F.3d at 178 n.2 (record citation omitted).  Therefore, upward variation from local utility rates may also demonstrate how Defendant's consumer rates are materially disconnected from their supply costs.

Plaintiff also provides another prospective metric as a comparison to Defendant's rates—the "Market Supply Costs" estimated by an undisclosed expert based on publicly available NYISO data.  (*See* Am. Compl. ¶¶ 52–54; Pl.'s Table 2.)  Defendant argues that the Court should "disregard" these calculations because Plaintiff "fails to plausibly link her unidentified expert's unexplained numbers to the relevant 'market' . . . ."  (Def.'s Mem. 9–10.)  However, at the pleading stage, Plaintiff was not obligated to attach an expert report or relay all the details of the methodology her expert used; instead, she only needed to make plausible allegations, which she has.  In *XOOM*, the Second Circuit concluded that almost identical circumstances may pass the pleading stage.  931 F.3d at 177 (noting that the plaintiffs had "alleged, with the support of . . . expert calculations . . . that [the defendant's] rates showed significant upward deviations from the Market Supply Cost and continued to rise even when that cost fell," which, "[a]t the pleading stage, . . . is sufficient to set forth a plausible allegation of breach of contract").  Therefore, the Court also declines to "disregard" the applicability of this metric.

Defendant also argues that the Court should disregard any implication that Defendant misled Plaintiff by "lur[ing]" her in with "low fixed teaser rates" and later charging her a higher variable rate.  (*See* Def.'s Mem. 10–11 (citation and quotation marks omitted).)  The Second Circuit has explained that there is nothing inherently wrong with business schemes that "offer initial discounts on subscriptions and memberships" in the hopes that "status quo bias" will lead their customers "stick with their current situation."  *Richards*, 915 F.3d at 103 (citation and

quotation marks omitted).  To the extent Plaintiff seeks to suggest that Defendant's rollover into the variable rate scheme was deceptive, such a claim would fail, as Defendant explicitly informed Plaintiff that the fixed rate agreement term was only "6 Months" and, following that, accounts would "automatically convert to a monthly variable price agreement with no end date . . . ."  (2012 Renewal Not.)  However, that is not really the crux of Plaintiff's claim.  Instead, Plaintiff clarifies that she refers to Defendant's low fixed rate as one fact to support her allegation that Defendant's variable rates are untethered to wholesale market supply costs.  (*See* Pl.'s Mem. 12.)  Plaintiff also refers to Defendant's low fixed rate as one element of support for her allegation that Defendant charges higher variable rates than other ESCOs.  (*See id*. at 13.)  Given that the Court is to assume that all of Plaintiff's allegations are true at the pleading stage, it is unclear why Defendant believes that the Court should disregard this allegation regarding other ESCOs.  (*See* Def.'s Reply Mem. 5–6.)  Plaintiff's allegation regarding other ESCO rates stems from the wide gap between Defendant's variable rates and local utility rates and/or "Market Supply Costs."  (*See* Pl.'s Mem. 13.)  Although not definitively proved within the Amended Complaint, this claim constitutes a plausible allegation or hypothesis, one that may or may not be supported over the course of the litigation through the use of discovery tools, such as document production, expert reports, and testimony.[3]

Defendant argues that *XOOM* does not stand for any "novel development in variable-rate case law" and that, instead, "it is the facts pleaded and the specific contract language that determine whether a claim is plausible."  (Def.'s Mem. 9.)  The Court does not necessarily

---

[3] This is a critical difference between the procedural posture of the instant Motion and the motion that was decided in *Richards*.  In *Richards*, the Second Circuit confirmed that, *after discovery*, there was simply "no evidence" that the defendant's rates were "higher than its competitors' rates," but here, other than the contract language itself, no evidentiary record has been established at all.  915 F.3d at 99 (citation omitted).

disagree. However, the Court similarly does not read *Richards* to stand for any novel development in variable-rate case law, either, i.e., that local utility rates or estimated supply costs can *never* serve as a valid metric by which to measure the performance of *any* ESCO contract. Based on the specific contract language at issue here, at minimum, Plaintiff has at least raised some questions regarding Defendant's performance by plausibly alleging (1) that Defendant's contract did not include terms explicitly allowing it to have unfettered price-setting discretion, and (2) that Defendant's prices materially differed from metrics that could be reasonable interpretations of the use of the word "Market" to describe the "Pricing Type." (2013 Renewal Not.) It is unclear whether "Market" refers to rates charged by other ESCOs, other rates available to consumers through local utilities, or the supply costs that Defendant pays as an ESCO. "This incomplete and confusing explanation for calculating variable market-based rates could lead a reasonable consumer to believe that he or she would receive a 'variable market rate,' i.e., once that was competitive with those charged by other ESCOs." *Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261, 2015 WL 5155934, at *4 (S.D.N.Y. Sept. 2, 2015) (italics omitted).[4]

---

[4] Defendant also repeatedly cites to *Sevugan v. Direct Energy Servs. LLC*, 931 F.3d 610 (7th Cir. 2019) to demonstrate support for the argument that, as a matter of law, local utility rates and/or wholesale supply costs do not constitute "valid market comparators" to an ESCO's consumer rates. *Id.* at 616–17. However, the Seventh Circuit's holding is not binding on this Court. Although the Second Circuit may have explicitly written as broad of a holding in *Richards* as the Seventh Circuit did in *Sevugan*, it chose not to do so. Instead, as discussed above, the Second Circuit relied heavily on the discretionary contract language present in *Richards*, which is not present here.

*Windley v. Starion Energy Inc.*, No. 14-CV-9053, 2016 WL 197503 (S.D.N.Y. Jan 8, 2016) is similarly unpersuasive. In that case, the contract at issue explicitly provided that the ESCO defendant "cannot guarantee savings" under its agreement. *Id.* at *3 (record citation and quotation marks omitted). Here, Defendant stated that it would aim to provide the "most competitive pricing," even within the context of offering variable rates. (*See* 2013 Renewal Not.) Combined with the label of "Market" under "Pricing Type," it is plausible that the contract language would reasonably have led Plaintiff to believe that Defendant would provide

Because all ambiguities must be resolved in favor of Plaintiff at this stage, the Court denies Defendant's Motion as to the breach of contract claim.  *See Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 220 (E.D.N.Y. 2018) ("[The contract] language, when read in the light most favorable to [the plaintiff], can be readily interpreted as a promise that [the plaintiff's] price [for home heating oil] would decline when market prices did.  The allegations . . . are sufficient, at this stage, to plausibly allege a breach of that promise."); *Mirkin v. Viridian Energy, Inc.*, No. 15-CV-1057, 2016 WL 3661106, at *9 (D. Conn. July 5, 2016) (denying motion to dismiss on similar contract claims where the utility contract referenced "wholesale market conditions"); *Claridge*, 2015 WL 5155934, at *6 (noting that the plaintiff "plausibly allege[d] that the [a]greement is confusing and ambiguous" and that whether the defendant "breached this provision cannot be resolved at the pleading stage" (citation omitted)); *Yang Chen v. Hiko Energy, LLC*, Nos. 14-CV-1771, 14-CV-2042, 2014 WL 7389011, at *6 (S.D.N.Y. Dec. 29, 2014) (denying motion to dismiss where the pleading contained "plausible factual allegations that [the] defendant did not charge [the] plaintiffs rates reflecting wholesale electricity and gas costs and other market-related factors" (record citation, emphasis, and quotation marks omitted)).

## 2.  Implied Covenant of Good Faith and Fair Dealing

"Under New York law, parties to an express contract are bound by an implied duty of good faith . . . ."  *Arcadia Bioscis., Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 159 (S.D.N.Y. 2018) ("The promise of good

---

"competitive" prices tied to some sort of "Market," and whether that "Market" referred to the supply market or the retail market is—at minimum—unclear.  (*See id.*)  In the absence of clear precedent establishing that Plaintiff's comparisons are invalid as *a matter of law*, the Court is bound to provide Plaintiff's claims with the same favorable inferences as it does with all plaintiffs at the pleading stage.

faith and fair dealing is treated as an implied provision in every contract . . . ." (citations and quotation marks omitted)).  The implied covenant is "breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."  *Skillgames, LLC v. Brody*, 767 N.Y.S.2d 418, 423 (App. Div. 2003) (citation and quotation marks omitted); *see also Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) ("The implied covenant . . . embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (citation and quotation marks omitted)).  "In order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'"  *Gaia House Mezz LLC v. State Street Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (citation omitted).

However, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."  *Arcadia*, 356 F. Supp. 3d at 400 (citation and quotation marks omitted); *see also Harris*, 310 F.3d at 81 ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *JGB (Cayman) Newton, Ltd. v. Sellas Life Scis. Grp. Inc.*, No. 18-CV-3095, 2018 WL 5266877, at *13 (S.D.N.Y. Oct. 23, 2018) ("When a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." (quotation marks and alteration omitted) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013))).  Alleging that a defendant's actions "were not undertaken in good faith" also does not necessarily seek to improperly "override the

express terms of [a] contract." *JJM Sunrise Auto., LLC v. Volkswagen Grp. of Am., LLC*, 997 N.Y.S.2d 270, 287–88 (Sup. Ct. 2004) (citation and quotation marks omitted).  This is especially true where "the contract [may] contemplate[] the exercise of discretion," as the doctrine of good faith and fair dealing includes an additional "promise not to act arbitrarily or irrationally in exercising that discretion."  *Lonner v. Simon Prop. Grp., Inc.*, 866 N.Y.S.2d 239, 245 (quotation marks omitted) (citing *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289 (N.Y. 1995)).

Here, it is plausible that Plaintiff's good faith and fair dealing claim could be distinct from Plaintiff's breach of contract claims.  "According to the [Amended] Complaint, [Defendant] violated the covenant by exercising [any price-setting] discretion [it may have had] in bad faith and in a manner inconsistent with [Plaintiff's] reasonable expectations."  *Claridge*, 2015 WL 5155934, at *6 (record citation omitted) (permitting a claim for breach of the covenant of good faith and fair dealing to survive a motion to dismiss in a similar ESCO variable-rate contract action); *see also Hamlen v. Gateway Energy Servs. Corp.*, No. 16-CV-3526, 2017 WL 892399, at *5 (S.D.N.Y. Mar. 6, 2017) (noting that the plaintiff had sufficiently "alleged [that the] defendant acted in bad faith by exercising its discretion to charge unreasonable rates to profiteer off its customers, who reasonably expected to pay [the] defendant competitive prices for natural gas" and that "the implied covenant of good faith and fair dealing requires [the] defendant to seek a profit that is commercially reasonable").  Here, Plaintiff expressly alleges that, even if contractually, "Defendant had unilateral discretion to set the variable rate for electricity," plaintiff "reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect the wholesale and retail market prices for electricity and that Defendant would refrain from price gouging."  (Am. Compl. ¶¶ 77–78.) Moreover, Plaintiff alleges that "[w]ithout these reasonable expectations, Plaintiff and other

Class members would not have agreed to buy electricity from Defendant." (*Id.* ¶ 78.)  Therefore, Plaintiff alleges a distinct basis from the terms of the contract itself for its good faith and fair dealing claim.

Of course, it may be true that Plaintiff cannot ultimately recover on *both* breach of contract claims *and* breach of covenant of good faith and fair dealing.  (*See* Def.'s Mem. 22.) For example, if a factfinder determines that Plaintiff's interpretation of the contract terms prevail and that the alleged metrics of comparison successfully show a breach of those terms, the covenant of good faith and fair dealing claim may become subsumed into the breach of contract claim.  On the other hand, it is conceivable that a factfinder might conclude that the contract itself did not promise what Plaintiff expected but that, nevertheless, Defendant violated a "duty of good faith" that it owed to less-informed consumers in providing something as universally necessary as utility services.  *Arcadia*, 356 F. Supp. 3d at 399 (citation and quotation marks omitted).  But these questions are not eligible for resolution as a matter of law at the pleading stage, because "Plaintiff has sufficiently pleaded that [D]efendant plausibly charged commercially unreasonable rates, and in so doing acted in bad faith or with improper motive." *Hamlen*, 2017 WL 892399, at *5 (citations and record citation omitted).  "Here, because the meaning of the [P]arties' contract has yet to be determined, it is too soon to address whether . . . [P]laintiff['s] claim of breach of the covenant of good faith and fair dealing is duplicative." *E*Trade Fin. Corp. v. Deutsche Bank AG*, No. 05-CV-0902, 2008 WL 2428225, at *26 (S.D.N.Y. June 13, 2008); *see also Hoover v. HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 249 (N.D.N.Y. 2014) (refusing to dismiss the good faith and fair dealing claim because the court could not "conclude as a matter of law that the . . . contracts [at issue] provide[d] the . . . [d]efendants with unfettered discretion," and the plaintiffs had properly alleged that the

defendants "improperly exercised their purported discretion").  Therefore, the Court denies

Defendant's Motion on this ground as well.

### 3.  Unjust Enrichment

As a general rule, the existence of a valid contract renders unjust enrichment and money

had and received unavailable as a remedy.  *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,

516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract

governing a particular subject matter ordinarily precludes recovery in quasi contract for events

arising out of the same subject matter." (citation omitted)); *see also Arbitron, Inc. v. Kiefl*, No.

09-CV-4013, 2010 WL 3239414, at *7 (S.D.N.Y. Aug. 13, 2010) ("Unjust enrichment is not

available where there is a valid contract between the parties covering the same subject matter."

(citation omitted)), *reconsideration denied*, 2010 WL 3927325 (S.D.N.Y. Oct. 6, 2010);

*AngioDynamics, Inc. v. Biolitec, Inc.*, 606 F. Supp. 2d 300, 305 (N.D.N.Y. 2009) ("Because the

dispute is covered by [a] contract, a claim in unjust enrichment cannot proceed."); *Am. Med.

Ass'n v. United Healthcare Corp.*, No. 00-CV-2800, 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5,

2007) ("[D]ecisions both in New York state courts and in [the Southern District of New York]

have consistently held that claims for unjust enrichment may be precluded by the existence of

a contract governing the subject matter of the dispute . . . .") (collecting cases).

The Court recognizes that, under Federal Rule of Civil Procedure 8(d), a plaintiff can

plead in the alternative such that the claimant can bring both breach of contract claims and

challenge the validity of the contract by alleging unjust enrichment.  *See Adler v. Pataki*, 185

F.3d 35, 41 (2d Cir. 1999) ("[Rule 8(d) ] offers sufficient latitude to construe separate allegations

in a complaint as alternative theories, at least when drawing all inferences in favor of the

nonmoving party as we must do in reviewing orders granting motions to dismiss . . . ." (citation

omitted)).  However, where the validity of a contract that governs the subject matter at issue is

not in dispute, and the claimant alleges breach of the contract, the claimant cannot plead unjust

enrichment in the alternative under New York law.  *See Beth Isr. Med. Ctr. v. Horizon Blue*

*Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006) (noting that

an unjust enrichment claim cannot be pled in the alternative when there is a "valid and

enforceable contract governing [the] . . . subject matter"); *King's Choice Neckwear, Inc. v.*

*Pitney Bowes, Inc.*, No. 09-CV-3980, 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23,

2009) ("Unjust enrichment may be [pled] in the alternative where the plaintiff challenges the

validity of the contract; it may not be [pled] in the alternative alongside a claim that the

defendant breached an enforceable contract." (citations omitted)), *aff'd*, 396 F. App'x 736 (2d

Cir. 2010); *see also Sikarevich Family L.P. v. Nationwide Mut. Ins. Co.*, 30 F. Supp. 3d 166, 172

(E.D.N.Y. 2014) (dismissing unjust enrichment claim, pled in the alternative with a breach

of contract claim, because the plaintiff did not challenge the existence of the insurance policy at

issue); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196

(S.D.N.Y. 2009) (dismissing unjust enrichment claim, pled in the alternative, noting that "[the

plaintiff's] failure to allege that the contracts at issue are invalid or unenforceable precludes it . . .

from seeking quasi-contractual recovery for events arising out of the same subject matter");

*AngioDynamics*, 606 F. Supp. 2d at 305 (dismissing unjust enrichment counterclaim, pled in the

alternative, "[b]ecause the dispute [at issue] [was] covered by the [undisputed] contract,

[meaning] a claim in unjust enrichment [could not] proceed").  Here, Plaintiff alleges that she

(and other members of the alleged Class) "entered into valid contracts with Defendant for the

provision of the electricity."  (Am. Compl. ¶ 69.)  Defendant has stated that it "does not dispute

the contract's existence," (Def.'s Mem. 23), and Plaintiff herself has admitted that she must

abandon this claim should "a valid contract exist[] between the [P]arties," (Am. Compl. ¶ 105).

Therefore, there is no "bona fide dispute concerning [the] existence of a contract," and the

"cause of action for unjust enrichment fails and should be dismissed."  *2002 Lawrence R.*

*Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 235 (S.D.N.Y. 2015)

(dismissing unjust enrichment claim at motion to dismiss stage).  Accordingly, Plaintiff's claim

for unjust enrichment collapses into the contract dispute, and the Court dismisses it.[5]

### 4.  NYGBL Claims

Plaintiff claims three distinct violations of the NYGBL.  In particular, Plaintiff alleges a

violation of NYGBL § 349, which prohibits deceptive business practice in general, a violation of

§ 349-d(3), which specifically prohibits deceptive practices in the marketing of energy services,

and a violation of § 349-d(7), which requires variable charges to be "clearly and conspicuously

identified" in every energy services contract.  *See* N.Y. Gen. Bus. Law §§ 349, 349-d(3), 349-

d(7).

#### a.  Statute of Limitations

The statute of limitations for a NYGBL § 349 claim is three years.  *See Charles Atlas,*

*Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 334 n.7 (S.D.N.Y. 2000).  Plaintiff complains that

the representations made in Defendant's 2013 Renewal Notice Letter (dated May 2013) did not

accurately reflect the charges that Plaintiff subsequently received for energy usage.  (*See* Am.

Compl. ¶¶ 28–29.)  Defendant argues that because the representations occurred in May 2013, and

the Complaint was not filed until April 2019, Plaintiff's claims under the statute are time-barred.

---

[5] Moreover, Defendant is also correct that, where "there is an adequate remedy at law," such as NYGBL § 349, "a court will not permit a claim in equity" for the same conduct.  *Forte v. Direct Energy Servs., LLC*, No. 17-CV-264, 2017 WL 3495861, at *7 (N.D.N.Y. Aug. 14, 2017) (citation and quotation marks omitted).  The unjust enrichment claim may also be dismissed on these grounds.

(*See* Def.'s Mem. 12–15.)  However, Plaintiff argues that, because each billing period constituted a rate "contrary to [the] promise[s]" in Defendant's Renewal Notifications, Defendant committed a "series of deceptive acts" that should be covered by the continuing violations doctrine.  (Pl.'s Mem. 14.)

"Where a [NYGBL] § 349 claim is based on a series of allegedly deceptive acts, . . . the 'continuing violations doctrine' applies and 'effectively tolls the limitations period until the date of the commission of the last wrongful act.'"  *Breitman v. Xerox Educ. Servs., LLC*, No. 12-CV-6583, 2013 WL 5420532, at *4 (S.D.N.Y. Sept. 27, 2013) (citation and alteration omitted).  For example, in *Harvey v. Metropolitan Life Insurance Company*, 827 N.Y.S.2d 6 (App. Div. 2006), the plaintiff alleged that an insurance contract had misleadingly marketed a policy to suggest that the insurance-holder's child may be covered beyond their 25th birthday when, in fact, the policy did not do so.  *See id*. at 6.  The plaintiff continued to pay premiums after the child's 25th birthday with the understanding that the child was covered by the policy.  *See id*.  Despite the fact that the plaintiff's child had turned 25 years old four years before the plaintiff commenced the NYGBL action, the court concluded that the plaintiff had successfully alleged a "continuing wrong," which is "deemed to have accrued on the date of the last wrongful act."  *Id*. at 6–7 (citation and quotation marks omitted).  Although a continuing violation theory must "be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct," repetitive, allegedly wrongful payments have frequently been interpreted to fall into the former and not the latter category.  *Shelton v. Elite Model Mgmt. Inc.*, 812 N.Y.S.2d 745, 758 (Sup. Ct. 2005) (citation and quotation marks omitted) (holding that each payment above a "statutory 10% fee" qualified for the continuing violations doctrine and noting that other cases have held that continuing violations occurred "each time a landlord collected an illegal rent," and

"each time a debtor defaulted on [a] loan, where creditor failed to accelerate [the] loan" (citations omitted)), *abrogated on other grounds by Rhodes v. Herz*, 84 A.D.3d 1 (2011).

Similarly, the Court finds that the continuing violation theory applies to Plaintiff's allegations here.  Assuming Plaintiff's allegations of Defendant's nonperformance are true, and construing all ambiguities in favor of Plaintiff—as it must—the Court observes that it is Defendant's purportedly unlawful monthly *charges* that made its initial representation to Plaintiff unlawful or misleading at all.  Had Defendant issued monthly charges that complied with Plaintiff's understanding of a "Market" price or comported with the comparator metrics in the Amended Complaint, Plaintiff would have no case at all.  The charges themselves—which were issued pursuant to a monthly term renewed on a monthly basis, and calculated through "a monthly variable rate methodology," (2013 Renewal Not.)—allegedly made Defendant's promises misleading.  These charges were periodic in nature, and each one, according to Plaintiff, violated the quality of pricing that Plaintiff thought she would receive from Defendant.  Therefore, each payment pursuant to each charge constitutes an individual "wrongful act." *Harvey*, 827 N.Y.S.2d at 6–7 (citation and quotation marks omitted); *see also Breitman*, 2013 WL 5420532, at *4 (holding that the "most recent allegedly deceptive act" was the most recent misapplication of a recurring loan prepayment); *Ring v. AXA Fin., Inc.*, No. 0111869/2004, 2008 WL 692564, at *4 (N.Y. Sup. Ct. 2008) ("Since [the] plaintiff continued to be billed and she has continued to pay, the statute has not expired on her claim.").  The Court therefore concludes that the statute of limitations does not bar Plaintiff's NYGBL claims.[6]

---

[6] Defendant's cited cases are distinguishable.  In *Henry v. Bank of America*, 48 N.Y.S. 3d 67 (App. Div. 2017), the complained-of conduct was distinct, allegedly deceptive enrollments in certain programs.  *See id.* at 70.  The bills that the plaintiff (unknowingly) paid were merely "the consequences of those wrongful acts" and "not the wrongs themselves."  *Id.*  That is not true of the instant Action.  Plaintiff does not allege that the enrollment into a variable rate plan itself was

b.  Deceptive or Unlawful Conduct

To state a claim under NYGBL § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675 (N.Y. 2012)).  Defendant argues that Plaintiff's NYGBL claims fail because she has failed to allege that any of Defendant's representations were deceptive or misleading "in a material way." (Def.'s Mem. 15.)  This argument fails for many of the same reasons discussed above regarding Plaintiff's breach of contract claim.

Defendant argues that the statement that Defendant would provide the "most competitive pricing" is puffery and not actionable under the NYGBL.  (2013 Renewal Not.)  Puffery indeed is not actionable under the NYGBL.  *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 52 n.14 (S.D.N.Y.  2019) (noting that puffery is "not actionable under . . . New York's consumer protection statutes," but predicting that dismissal on this ground would likely occur on a motion for *summary judgment* (citations omitted)).  "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language."  *Kacocha v. Nestle Purina Petcare*

---

fraudulent; rather, it is the monthly calculations of the variable rate that underlie Plaintiff's NYGBL claims.

*Pike v. New York Life Insurance Company*, 901 N.Y.S.2d 76 (App. Div. 2010) is inapplicable for similar reasons.  The alleged wrong was the initial inducement into purchasing "unsuitable [insurance] policies," for which the plaintiffs continued to pay the contractual premiums over a period of time.  *Id.* at 81.  Here, the wrongs *are* the monthly bills, which, according to Plaintiff, fail to provide the competitive rates that Defendant purported to provide.

*CIT Bank, N.A. v. Nwanganga*, 328 F. Supp. 3d 189 (S.D.N.Y. 2018) does not actually apply the continuing wrong doctrine to the NYGBL § 349 claim.  *See id.* at 203.  Neither does *Gaidon v. Guardian Life Insurance Company of America*, 750 N.E.2d 1078 (N.Y. 2001).  *See id.* at 1083–84.  However, to the extent *Gaidon* applies, it appears to favor Plaintiff, as the Court of Appeals reasoned that it was not necessarily the date of the purported misrepresentation but rather the date that the plaintiffs experienced a "measurable damage" from the misrepresentation that matters for statute of limitations purposes.  *Id.* at 1084.

*Co.*, No. 15-CV-5489, 2016 WL 4367991, at *16 (S.D.N.Y. Aug. 12, 2016) (citation and

quotation marks omitted).  And it is true that "vague statements of a product's superiority are

non-actionable puffery."  *Elkind v. Revlon Consumer Prods. Co.*, No. 14-CV-2484, 2015 WL

2344134, at *13 (E.D.N.Y. May 14, 2015) (citation omitted).  However, the descriptor "most" in

the phrase "*most* competitive," (2013 Renewal Not. (emphasis added)), suggests an objective,

measurable level of performance, which could reasonably be "understood as a promise that the

average . . . customer [of Defendant] saves money as compared to the utilities or other [ESCO]

competitors" who also offer variable rates, *Viridian Energy*, 2016 WL 3661106, at *6

(distinguishing statements about generally "competitive" rates from more objective descriptions).

In any event, the argument also fails because Plaintiff relies on more than the phrase about

competitive rates to support its NYGBL claims.  *See Sitt v. Nature's Bounty, Inc.*, No. 15-CV-

4199, 2016 WL 5372794, at *11 n.12 (E.D.N.Y. Sept. 26, 2016) (denying motion to dismiss

where the plaintiff's allegations relied on more than a statement that "may qualify as puffery").

For example, Plaintiff also alleges that Defendant's representations that it would seek to provide

a "Market" "Pricing Type" through a "monthly variable rate methodology" suggested to

customers that its variable rates would be correlated to some measure of market rates, which

could mean supply costs or other ESCO rates.  (2013 Renewal Not.; Am. Compl. ¶¶ 29–30.)

Because there is no clear understanding of what these terms reasonably conveyed to

consumers in the 2013 Renewal Notification, the question of whether the representation was

"materially misleading" cannot be resolved as a matter of law at the pleading stage.  In

accordance with how many other district courts in the Second Circuit have ruled under similar

circumstances, this Court denies Defendant's Motion on this ground.  *See Lugones v. Pete &*

*Gerry's Organic, LLC*, —F. Supp. 3d—, 2020 WL 871521, at *9 (S.D.N.Y. Feb. 21, 2020)

("There is significant authority supporting the idea that it is inappropriate for a court to decide whether a reasonable consumer could be misled at the Rule 12(b)(6) stage, and the Court finds that authority persuasive here." (citation omitted)); *Viridian Energy*, 2016 WL 3661106, at *6–7 (finding it plausible that the plaintiffs alleged a material representation where some statements could be interpreted to mean that the defendants would charge them utility rates "based on market conditions"); *Claridge*, 2015 WL 5155934, at *6 ("Because the [Amended] Complaint plausibly alleges that a reasonable consumer could be materially misled by the [a]greement's language concerning variable monthly rates, the [Motion] . . . is denied."); *Chen*, 2014 WL 7389011, at *4 (denying motion to dismiss on the NYGBL claim because the plaintiffs "plausibly alleged [that the] defendant billed them more for electricity . . . than it represented it would bill them, and thereby engaged in 'deceptive' conduct" (citation omitted)).

### c.  Causation

Defendant argues that, even assuming that Plaintiff's claims were timely and that Defendant's statements were deceptive within the meaning of NYGBL § 349, Plaintiff has not pled causation, i.e., that Plaintiff was aware of the deceptive conduct when "deciding to allow her fixed-rate term to expire and automatically convert to variable terms."  (Def.'s Mem. 17.)  In support of this, Defendant relies principally on a statement by Plaintiff's counsel in an Opposition to Defendant's Pre-Motion Letter, in which counsel wrote that Plaintiff "did not have a clear recollection of the circumstances surrounding her enrollment with NYSEG Solutions in 2009 or precisely how she was transitioned to a variable rate" contract with Defendant.  (*See* Dkt. No. 24.)

Defendant appears to assume that the Court may consider this statement outside of the pleadings in determining this Motion but cites to no case law in support of that assertion.

Indeed, the law is clear that the Court may only consider "the [Amended Complaint] in its entirety, as well as . . . documents incorporated into the [Amended] [C]omplaint by reference, and matters of which a court may take judicial notice." *In re Transcare Corp.*, 602 B.R. 234, 243 (S.D.N.Y. 2019) (citation and quotation marks omitted). Plaintiff's response to Defendant's Pre-Motion Letter was not incorporated into or filed with the Amended Complaint. When a district court is "presented with matters outside the pleadings," the Second Circuit has instructed a district court to either "exclude[] the extrinsic documents" or to "convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (citations omitted). The Court sees no need to convert the Motion to a summary judgment motion at this stage.[7]

Moreover, the Amended Complaint does sufficiently plead causation. When it comes to claims under NYGBL § 349, it is sufficient to allege that "because of [the] defendant's deceptive act, . . . [the plaintiff] suffer[ed] a . . . loss." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612–13 (N.Y. 2000). In other words, "reliance need not be pled," and to sufficiently plead causation, it is enough for a plaintiff to "plead the disclosures he or she received were inadequate, misleading, or false, and that she was injured as a result of the insufficient or false disclosures." *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015) (citations and quotation marks omitted). The Amended Complaint did just that. Plaintiff pled that Defendant communicated

---

[7] In any event, even if the Court were to consider Plaintiff's counsel's statement, it would not impact the disposition of this issue. Just because Plaintiff did not recall the exact mechanism by which her fixed-rate contract converted to a variable-rate contract does not mean that Plaintiff did not read and/or understand that Defendant had promised "competitive rates," "Market" pricing, or otherwise conveyed to Plaintiff that she could reasonably expect prices that were tethered to some measure of the utilities market or prices that were lower than other ESCO variable rates. (*See* 2013 Renewal Not.)

that the "Pricing Type" for the variable rate would be "Market," that the rate would be calculated

per a monthly methodology, and that Plaintiff would receive the "most competitive pricing."

(Am. Compl. ¶¶ 29–33.)  Plaintiff alleges that, instead of providing those rates, Defendant

charged rates that were "untethered from wholesale electricity prices and competitors' rates."

(*Id*. ¶ 37.)  Furthermore, as a result of Defendant's alleged failure to perform on the terms it set

forth, Plaintiff has "suffered and continue[s] to suffer an ascertainable loss of monies."  (*Id*. ¶ 89;

*see also id.* ¶ 7 ("As a result of Defendant's deceptive conduct, Plaintiff incurred excessive

charges for electricity.").)[8]  At this early juncture in the case, it would be inappropriate for the

Court to conclude, based on a vague statement from Plaintiff's counsel, that Plaintiff cannot

show causation under NYGBL § 394.  Therefore, the Court denies Defendant's Motion on this

ground.  *See Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 147 (S.D.N.Y. 2014) ("To

satisfy the causation requirement, nothing more is required than that a plaintiff suffer a loss

because of [the] defendant['s] deceptive act." (citation, alterations, and quotation marks

omitted)); *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 445–46 (S.D.N.Y.

2005) (describing how a requirement that "plaintiffs confirm that they saw or heard each

[misrepresentation]" at issue goes more toward "reliance" than causation in the context of the

NYGBL (citation omitted)); *Wilner v. Allstate Ins. Co.*, 893 N.Y.S.2d 208, 218 (App. Div. 2010)

(finding it sufficient to allege that, "as a result of the defendant's conduct," the plaintiffs were

"forced to incur" certain costs and expenses NYGBL § 349-d(7) (quotation marks omitted)).

---

[8] Although Defendant is correct that reliance and causation are separate concepts, (Def.'s
Reply Mem. 7–8), "[i]n the context of fraud, they are often intertwined," *Stutman*, 731 N.E.2d at
612 (citation omitted); *see also Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 170–71
(S.D.N.Y. 2014) ("The defendant essentially attempts to hold a claim under [NYGBL] § 349 to
the same standard applicable to a common-law fraud claim by demanding that the plaintiff
specifically show reliance on a statement.  This argument . . . is precisely what the New York
Court of Appeals cautioned against in [*Stutman*, 731 N.E.2d 608].").

d.  Violation of NYGBL § 349-d(7)

NYGBL § 349-d(7) provides that "every contract for energy services and . . . all marketing materials provided to prospective purchasers of such contracts" must "clearly and conspicuously identif[y]" "all variable charges."  N.Y. Gen. Bus. Law § 349-d(7).  In addition to the general NYGBL arguments Defendant made above, Defendant also specifically argues that the law only requires Defendant to have disclosed the existence of a variable rate instead of the method by which Defendant would compute the variable rate.  (*See* Def.'s Mem. 18.)  Plaintiff alleges that Defendant failed to meet the requirements of the statute by stating only that its "month-to-month variable rate would be priced based on the 'market'."  (Am. Compl. ¶ 98.)  Plaintiff alleges that this vague statement did not clearly and conspicuously identify "all variable charges."  (*Id.*)

Other district courts within the Second Circuit have concluded that NYGBL § 349-d(7) does not necessarily require the disclosure of the mechanism by which an ESCO would calculate variable rates but merely "the existence of a variable rate."  *Viridian Energy*, 2016 WL 3661106, at *5; *see also Forte*, 2017 WL 3495861, at *6 (noting that, at minimum, an ESCO defendant must "clearly and conspicuously disclose that it will charge a variable rate per [kWh] after the initial contract period" (quotation marks omitted)).  Judge Pauley explained the following during an oral ruling in *Wise v. Energy Plus Holdings, LLC*, Case No. 11-CV-7345 (S.D.N.Y. 2011):

> The statute requires that variable charges be 'identified,' not that they be 'explained,' or that their 'basis' be identified.  Section 349-d elsewhere makes a distinction between the obligation to identify and the obligation to explain.  Further, there is little in the legislative history of the statute or in the Public Service Commission's regulations . . . to suggest that [§] 349-d(7) is meant to address the content of an energy supply company's identification of its variable charges rather than the plain fact that they are variable. . . .  There is no allegation here that [the defendant's] statements are buried in fine print, illegible, or otherwise hidden from consumers, and for whatever the statements lack in detail, they plainly identify that [the defendant's] supply prices are variable.

(*See* Matthews Decl. Ex. D ("*Wise* Hr'g Tr."), at 17–18 (citations omitted) (Dkt. No. 29-4).)

Here, in the 2012 Renewal Notification, Defendant informed Plaintiff that it would be renewed for a 6 month "Fixed" Contract that would be automatically renewed "With Notification." (2012 Renewal Not.) Neither the letter within the text nor the call-out box present on the first page mentions a variable rate. Rather, the only mention of a variable rate occurs on the back of the letter in the General Terms and Statement of Customer Rights & Responsibilities, where, in small print, at the very end of the "Terminal and Renewal Notification" section, it reads, "If a renewal notification does not include a new fixed, blended, or indexed price termed offer, accounts will automatically convert to a monthly variable price agreement with no end date and no associated termination fee." (*Id*. at ECF 3.) On the 2013 Renewal Notification, which was intended to provide notice for the variable rate contract itself, the letter writes "Variable" next to "Renewal Price" and states that the agreement will renew "on a month-to-month basis" "with a monthly variable rate methodology." (2013 Renewal Not. ECF 2.) Again, in small print on the back of the letter, under the General Terms and Statement of Customer Rights & Responsibilities, the "Termination and Renewal Notification" section ends with the sentence, "If a renewal notification does not include a new, fixed, blended, or indexed price termed offer, accounts will automatically convert to a monthly variable price agreement with no end date and no associated termination fee." (*Id*. at ECF 3.)

The Court agrees that the plain text of NYGBL § 349(d)-7 and the surrounding case law leads to the conclusion that the statute only contemplates the required disclosure of the *existence* of a variable rate and not necessarily the precise methodology by which it calculates it. To the extent Plaintiff's § 349(d)-7 claim relies on the same issues as its other NYGBL or breach of contract claims (i.e., that the methodology by which variable rates were calculated was not

disclosed or misleading), those allegations are not appropriately pursued under this section of the statute.  (*See* Am. Compl. ¶¶ 99–100 (alleging that Defendant violated § 349(d)-7 by failing to provide any "description of its variable rate pricing methodology" or by correlating the variable rate to "Market" pricing).)  However, Plaintiff does allege at least once that neither the 2012 nor 2013 Renewal Notification discloses that "Defendant will charge a variable rate per kWh."  (*Id*. ¶ 39.)  The *Forte* court suggested that one material element of proper disclosure under § 349(d)-7 is clear and conspicuous disclosure of "a variable rate *per kW[h]*."  2017 WL 3495861, at *6 (emphasis added).  And the *Mirkin* court engaged in a factual analysis of the disclosures, noting that "in *several* different places," the contract notified the consumer that it would change to a variable rate plan after the first six months.  2016 WL 3661106, at *5 (emphasis added).  This Court is not confident enough in the clarity of the language of the Renewal Notifications to rule as a matter of law that the existence of a variable rate plan was "clearly and conspicuously" disclosed to Plaintiff.  And Plaintiff has made at least one allegation to suggest that the existence of the variable rate plan itself was not clear to her.  (*See* Am. Compl. ¶ 39.)

Therefore, although the Court forecloses Plaintiff from making the argument that Defendant was required to disclose the exact methodology for *calculating* the variable rate plans under NYGBL § 349(d)-7, "it is plausible that a reasonable jury could find that Defendant's disclosure [itself] . . . fails to be conspicuous."  *Forte*, 2017 WL 3495861, at *7.[9]  Accordingly, the Court does not entirely dismiss Plaintiff's § 349(d)-7 claim but does limit the scope of it.

---

[9] Of course, this does not affect the range of arguments that Plaintiff may pursue in support of her other, broader NYGBL claims.  That is, Plaintiff may be able to argue that failing to disclose the variable rate methodology or implicitly suggesting that the variable rate corresponds closely to "Market" pricing was nevertheless "materially misleading."  *Orlander*, 802 F.3d at 300 (citation and quotation marks omitted).  However, that level of detail is simply not required under § 349(d)-7.

5.  Class Standing

Defendant argues that Plaintiff lacks standing to bring a class suit on behalf of all of

Defendant's customers in the United States who were legacy NYSEG Solutions and/or Energetix

customers and who were charged a variable rate for residential electricity services by Defendant

between April 2013 and the present.  (*See* Def.'s Mem. 24; Am. Compl. ¶ 62.)

"The doctrine of standing tests whether a prospective litigant may properly invoke the

power of the federal courts," but class actions under Rule 23 of the Federal Rules are a well-

known "exception to the general rule that one person cannot litigate injuries on behalf of

another."  *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d Cir. 2018)

(citations omitted).  Defendant argues that the Amended Complaint fails to plausibly allege

standing on behalf of all former NYSEG Solutions and Energetix customers in the United States,

because it does not plausibly allege that Energetix customers had similar contracts prior to

Defendant's purchase of both NYSEG Solutions and Energetix, the nature of the representations

made to Energetix and/or non-New York customers, and what rates were ultimately charged to

Energetics and/or non-New York customers.  (*See* Def.'s Mem. 25.)  However, Plaintiff has

alleged that Defendant sent "uniform notices" to their legacy customers from NYSEG Solutions

and/or Energetix that promised competitive, market-based variable rates.  (Am. Compl. ¶ 2.)

And Plaintiff has further alleged that Defendant engages in a uniform policy of price gouging all

of its customers.  (*Id.* ¶¶ 2, 24, 68.)  The Second Circuit has explicitly instructed that "non-

identical injuries of *the same general character* can support standing" for a class action.

*Langan*, 897 F.3d at 94 (emphasis added) (citation omitted).  And "courts in th[e Second C]ircuit

have construed the payment of a premium price to be an injury in and of itself[, and] . . . where

plaintiffs allege that customers paid a premium price based on a misrepresentation, those

34

customers can have standing under Article III." *Guariglia v. Procter & Gamble Co.*, No. 15-CV-4307, 2018 WL 1335356, at *12 (E.D.N.Y. Mar. 14, 2018) (citations and quotation marks omitted). Under analogous circumstances, the Second Circuit determined that standing existed for a plaintiff who sought to represent a variety of certificate holders in connection to certain mortgage investments, despite the fact that other certificate holders were "outside the specific tranche from which the named plaintiff purchased certificates" and were subject to "different payment priorities." *Langan*, 897 F.3d at 94 (referring to *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012)). Similarly, here, it may be true that Energetix customers and NYSEG Solutions customers had different contracts before Defendant bought them. It may also be true that customers outside New York received slightly different terms or offers than those that Plaintiff received. But the fact that the "ultimate damages [for each member of the class may] . . . vary . . . is not sufficient to defeat class certification under Rule 23(a), let alone class standing." *NECA*, 693 F.3d at 164–65 (citation and quotation marks omitted).

In any event, the Court simply does not know whether the contracts are so materially different that Plaintiff will not be able to represent the entire Class. Plaintiff has alleged that Defendant has engaged in similarly deceptive behavior with all its legacy NYSEG Solutions or Energetix customers. On the limited record before it, this Court must accept this allegation as true, and "cannot conclude that the variation between the [contracts] . . . are meaningful enough to destroy subject matter jurisdiction—particularly where the Second Circuit did not find variation in risk profiles, interest rates, maturity, and subordination sufficient to warrant dismissal of a putative securities class action on Article III grounds in *NECA*[.]" *O'Neill v. Standard Homeopathic Co.*, 346 F. Supp. 3d 511, 528 (S.D.N.Y. 2018) (citation and quotation

marks omitted) (declining to dismiss class action allegations for lack of standing where plaintiff sought to bring claims on behalf of all purchasers of a certain homeopathic medicine); *see also Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 563 (S.D.N.Y. 2016) (denying motion to dismiss based on class standing even though "the nature and content of the specific misrepresentation alleged" may vary across different products and purchases encompassed by the putative class (citation and quotation marks omitted)); *Moses v. Apple Hosp. REIT Inc.*, No. 14-CV-3131, 2016 WL 8711089, at *4 (E.D.N.Y. Sept. 30, 2016) (noting that where the individual plaintiff has Article III standing to sue, "the more prudent approach is to analyze class standing at the class certification stage"); *Kacocha*, 2016 WL 4367991, at *11 (noting that whether class members' "injuries are sufficiently similar" is a question that is best "addressed upon motion for class certification" (citation and quotation marks omitted)); *Hart v. BHH, LLC*, No. 15-CV-4804, 2016 WL 2642228, at *3 (S.D.N.Y. May 5, 2016) (noting that courts "deny motions to dismiss" regarding class standing because "any concerns regarding the differences can be addressed at the class certification stage" (citation and quotation marks omitted)).

## III.  Conclusion

For the foregoing reasons, the Court grants Defendant's Motion To Dismiss with respect to Plaintiff's unjust enrichment claim and to limit the scope of Plaintiff's NYGBL § 349(d)-7 arguments but denies it on all other grounds.  As Plaintiff has already amended her Complaint once, the dismissal is with prejudice.  Therefore, the Action will proceed on the remaining claims.

The Clerk of the Court is respectfully requested to terminate the pending Motion.  (Dkt. No. 27.)

SO ORDERED.

DATED:      June 12, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE